

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-09-00112-CR**

TERRANCE FORD                                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

------------

### FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1] ON
## APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

------------

Pursuant to rule of appellate procedure 50, we have reconsidered our previous opinion upon reviewing Appellant Terrance Ford's petition for discretionary review.[2] We withdraw our July 15, 2010 opinion and judgment and substitute the following.

---

[1] ... *See* Tex. R. App. P. 47.4.

[2] ... *See* Tex. R. App. P. 50.

A jury convicted Appellant of possession of a controlled substance with intent to deliver and assessed his punishment at life imprisonment. The trial court sentenced him accordingly. In two points, Appellant contends that the evidence is legally and factually insufficient to support his conviction. Specifically, he contends that there is no evidence or insufficient evidence that he possessed the drugs. Because we hold that the evidence is sufficient to support Appellant's conviction, we affirm the trial court's judgment.

The arresting officer, DPS Trooper Woody Gosser, testified that he stopped a car for speeding on I-35 in Denton County, Texas. The car was traveling seventy miles per hour in a sixty-five mile-per-hour zone. Gosser explained that in drug interdiction, law enforcement officers look for cars traveling under the speed limit or those traveling "just over the posted speed limit" because typically, persons transporting large amounts of narcotics are not going to travel at a speed that is much more than the speed limit.

The car's windows, excluding the windshield, were tinted black. As Gosser approached the car from the passenger side, he noticed that the rear passenger window came down. He smelled burnt marijuana. As he moved closer to the rear passenger, the rear passenger window closed, and the driver's window rolled down. When Gosser first walked up and looked in the car, he noticed that three men were in the car, and he saw "blunt" material on the floorboard and in the ashtray. That is, tobacco that appeared to have been taken out of a cigar was hanging out of the

2

ashtray, and the cellophane wrapper of a cigar was on the floorboard. According to Gosser, the cellophane contained enough tobacco to cover an entire cigar. After seeing the "blunt" material, Gosser decided to search the car.

Gosser testified that Appellant was the rear passenger and identified him at trial. Gosser testified that during the stop, Appellant was overly nervous and breathing hard, his hands were shaking, he would not look at Gosser, and he did not want anything to do with Gosser.

The driver was interviewed separately from his two passengers for safety reasons, according to Gosser. The driver told Gosser that Appellant had flown from Oklahoma City to Houston for a wedding but that the driver and the front seat passenger were using the driver's girlfriend's car to take Appellant back to Oklahoma City in a quick turnaround trip. The three men led Gosser to believe that they were cousins.

Gosser testified that second- or third-party cars are typical in the transport of large quantities of drugs because such vehicles cannot be seized. He also testified that Houston is a source city—"where large quantities of narcotics are broke[n] down or shipped to and the people come in and buy and distribute out to their destination"—and that Oklahoma City is actually becoming both a source and a destination point but that "it's usually just a destination point." Finally, he testified that unreasonable travel plans are also something that he is "trained to look for" in drug interdiction, and he classified the three men's stories as unreasonable.

3

Gosser testified that in searching the car, he found approximately eight cell phones. They were all around the passenger compartment—the front passenger seat, the back seat, the center console, "[a]round the car," and "everywhere [the officer] turned." Jeff Davis, supervisor of the Denton County Drug Enforcement Unit, testified that the number of cell phones was significant

> [b]ecause normally what people do that are involved in the drug trade, is they'll have—this is basically my business phone, and your business phone is your dirty phone. Usually it's a prepaid phone like Boost or Verizon sells them. You can buy them for 19.99, load them with minutes, and if you get in trouble you can throw them out the window, and you have lost 20 bucks.
>
> Then they'll have the phone they use with the family, normal communication that may or may not be in their name, but nobody involved in this business is going to call this phone. The only phone calls you get on the dirty phone are related to this. Like I said, that's a dime a dozen.
>
> A lot of times they're also aware of Title III investigations with the Federal Government; we do wiretap investigations. They know that we do Title III investigations, so they change their phone numbers continuously. 19.99, you can buy a phone, and it can be gone the next [da]y. They roll them over and over and over. When they do that, they accumulate phones.
>
> It's not uncommon for us to run search warrants and find drawers full of cell phones. That's phones that basically have run their course, and they dispose of them. They call them burners, is what they're called. They'll use their burner until they get done using their burner. Or somebody goes to jail that's one of their associates, that phone is in the trash, that phone's out. They'll just keep rotating the phones over and over.

Gosser also found "large amounts of trash in the backseat, fast food wrappers, things like that from going through drive-thrus." He explained at trial that people

4

transporting large quantities of drugs do not want to leave their car, so they go to fast-food places. Davis pointed out to the jury that vehicles carrying large quantities of drugs have "indicators inside the vehicle of long travel; [the people transporting the drugs are] basically living out of a car" because they are responsible for getting the drugs safely from Point A to Point B.

Gosser also noticed that the car's air fresheners were fresh, and he explained to the jury that it is common practice to use air fresheners to mask the scent of narcotics when hauling large amounts. Davis similarly testified that multiple air fresheners would be used to mask the odors in vehicles transporting large quantities of drugs.

A search of the trunk yielded just under four kilograms of cocaine hidden under the lining of the trunk. The drugs consisted of five separate bundles, three wrapped in duct tape and two wrapped in electrical tape. Gosser testified that it was "eight and a half pounds of quality cocaine that is not for personal use of anybody in the car. . . . It's packaged and concealed inside of a vehicle that's consistent with the distribution of narcotics." Davis testified that the cocaine would be worth about $400,000 to end users. He also testified that having multiple people in the vehicle, known in the drug trade as "rolling" or "running cat," is a way of protecting the drugs during transport and also at the location of the sale. Finally, when questioned,

> In your training, in your years of experience, Jeff, is it conceivable, based on what you know, that there could be three people who are close to each other, who know each other well, running this amount of

5

dope from a hub city or source city to a destination city and somebody not be in on it?

Davis answered, "No."

Nobody's fingerprints were on the cocaine. No weapons or other drugs, including marijuana, were found. After Gosser found the cocaine, he arrested all three men. He explained to the jury why he arrested all three men:

> [I]t's the total amount of everything that I saw out there all on the side of the road: The travel plans, the marijuana-type issue with the cigars, the air fresheners, the trash, the eight cell phones. The origin of Houston, destination of Oklahoma City; the travel plans of flying there but, you know, 15-, 18-hour trip back with a large amount of cocaine that costs a large amount of money, you would have to have a vested interest to be in that vehicle.

He based his conclusions on experience and training.

In his two points, Appellant contends that there is no evidence or insufficient evidence that he possessed the drugs; specifically, he argues that there is no evidence or insufficient evidence that he knew the cocaine was in the trunk of the car. After this court issued its original opinion, the Texas Court of Criminal Appeals held "that there is no meaningful distinction between a *Clewis* factual-sufficiency standard and a *Jackson v. Virginia* legal-sufficiency standard" and that

> the *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. All other cases to the contrary, including *Clewis*, are overruled.[3]

---

[3] *... Brooks v. State*, No. PD-0210-09, 2010 WL 3894613, at *14 (Tex. Crim. App. Oct. 6, 2010).

6

Accordingly, we apply the same standard of review to both of Appellant's sufficiency complaints. In reviewing the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[4] This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.[5]

As the Texas Court of Criminal Appeals has held,

> To prove unlawful possession of a controlled substance, the State must prove that: (1) the accused exercised control, management, or care over the substance; and (2) the accused knew the matter possessed was contraband. Whether this evidence is direct or circumstantial, "it must establish, to the requisite level of confidence, that the accused's connection with the drug was more than just fortuitous. This is the whole of the so-called 'affirmative links' rule."[6]

Given the men's close relationship, the presence of the "blunt" materials, the odor of marijuana, the presence of the cocaine in the vehicle in which they traveled, the large amount of the cocaine, Appellant's extreme nervousness at the stop, the presence of the many cell phones, fresh air fresheners, and fast-food trash, and the purported reason for all three men being in the car, and applying the appropriate

---

[4] *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

[5] *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778.

[6] *Poindexter v. State*, 153 S.W.3d 402, 405–06 (Tex. Crim. App. 2005) (citations omitted).

standard of review, we hold that the evidence is sufficient to support Appellant's conviction.  We overrule Appellant's two points.

Having overruled both of Appellant's points, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  October 28, 2010